THE STATE, REEVES, PROSECUTOR, v. BARRETT ET AL.

*Certiorari* to set aside the consolidation of three incorporated school districts in Orange, Essex county.

THE STATE, BABBITT ET AL., PROSECUTORS, v. BALDWIN, COLLECTOR, ETC.

*Certiorari* to set aside school tax.

THE STATE, PIERSON ET AL., PROSECUTORS, v. CONDIT, COLLECTOR, ETC.

*Certiorari* to set aside school tax.

THE STATE, THE ORANGE BANK ET AL., PROSECUTORS, v. SPOTTISWOODE, COLLECTOR, ETC.

*Certiorari* to set aside school tax.

1. To abolish an incorporated school district, it must be done by the town superintendent with the assent of a majority of the legal voters of the district, and then the superintendent and trustees must jointly certify that the district has been abolished by the superintendent, with the assent of a majority of the legal voters of the district: or it may be abolished by the superintendent and trustees associated, by the assent of the town committee with the superintendent, with the assent of a

State v. Barrett et al.

majority of the legal voters of the district,' in which case, also the superintendent and the trustees must certify as aforesaid.

2. If the trustees are associated with the superintendent by the action of tho school committee, the superintendent and trustees are a joint board to determine—1st, that each person offering to vote is a legal voter; 2d, if such voter give a legal assent to such abolishment; 3d, that a majority of the legal voters give such assent; 4th, to adjudicate and decree that such district is abolished; and, 5th, execute such a certificate of abolishment and file it as directed by law.

3. If the trustees are not associated with the superintendent by the action of the town committee, then the act of abolishment is done by the town superintendent alone, with the assent of the majority of the legal voters, in which case the superintendent and the trustees are a joint board to determine—1st, whether each person offering his vote is a legal voter; 2d, if such voter gave a legal assent to such abolishment; 3d, if a majority of the legal voters gave such assent; and 4th, upon the abolishment of the district, by such assent of a majority of legal voters, the superintendent and trustees are to execute and file with the proper officer the certificate of abolishment.

4. A board composed of the town superintendent and two out of three of the trustees of three incorporated school districts has no jurisdiction over the subject matter of an abolishment of any one of the districts; and a certificate by a board so composed, that three such districts are abolished, is a nullity and void, and none of the districts are abolished or affected by such a certificate or the action of such board.

5. The attempt by the superintendent to form a new incorporated district out of the territory of two or more incorporated districts, before the old districts are legally abolished, is a nullity and void; and all taxes imposed by such attempted consolidated district are illegal and will be set aside.

For the prosecutor, *J. W. Field.*

The opinion of the court was delivered by

VREDENBURGH, J.    Previous to March, 1862, St. Mark's, Central, and Ashland, were three separate incorporated school districts in the town of Orange, in the county of Essex. On that day, two of the trustees of St. Marks, two of Central, and two of Ashland, with the town superintendent of the township, signed a joint certificate in the following words:

" To the clerk of the county of Essex, New Jersey :

We, the undersigned, trustees of the St. Mark's, Central, and Ashland corporated school districts in the town of Orange,

together with the town superintendent of public schools in the said town of Orange, certify to you that, by and with the consent of the majority of the legal voters in each of the said districts, respectively, they are abolished, agreeably to the provisions of the law in such case made and provided." '

Shortly after this certificate was made the town superintendent undertook to make a new district, embracing all of the territory of all the said three districts, to be called the Central school district, and afterwards a tax was voted by a meeting of the inhabitants of said new consolidated school district of $3500 for school purposes, whereupon these four *certioraris* were brought; the first to set aside the proceedings declaring the three original districts abolished, and the three last to set aside the said taxes against the prosecutors.

The main question argued by counsel has been whether the three original districts were legally abolished? for, if they were not, the new one, made by consolidating the three, as well as the tax imposed by it, must be illegal.

Were the three original districts legally abolished?

If abolished at all it must be by force of the above cited certificate. This raises for our consideration two questions. First, what steps are necessary to legally abolish an incorporated school district? and, second, have such steps been taken in the case before us?

*First.* What steps are necessary to legally abolish an incorporated school district? By the act of 1846, *Nix. Dig.* 734, *pl.* 12, power is given to the town superintendent to alter and change the districts as circumstances may require. By *pl.* 24 of the same act, the trustees of the district may be associated by the action of the town committee with the superintendent in the creation or alteration of a district, and their action is final.

By the act of 1851, *Nix. Dig.* 728, *pl.* 41, an incorporated district cannot be abolished or altered without the consent of a majority of the taxable inhabitants of the district and in case the same shall be abolished, the superintendent and

the trustees shall make and sign a certificate thereof and have the same recorded by the clerk of the county.

By the act of 1860, *Pam. Laws, p.* 617, § 1, it is provided that any incorporated school district may be altered or abolished by the town superintendent, with the assent of a majority of the legal voters of the district, provided that one district shall not absorb another district, or part thereof, without the consent of said district.

By the act of 1846, first named above, the superintendent has power to alter and change districts alone, and without being associated with and procuring the assent of any one. By the 17th section of the same act, the trustees, by the assent of the town committee, may be associated with the superintendent. If they are so associated, an alteration is the joint act of the trustees and superintendent. But if they do not so become associated, the superintendent may abolish or alter by his sole authority. By the said 10th section of the act of 1851, the abolishing of a district, whether done by the superintendent alone or in conjunction with the trustees, can only be with the assent of the majority of the taxable inhabitants; and the superintendent and trustees must jointly certify that the superintendent, with the assent of the said majority, has abolished, and record the same. Then comes in the said act of 1860. This alters the previous act in two things, *viz.,* it, in the first place, gives power to the superintendent, with the assent of a majority of the legal voters, to abolish a district without the concurrence of the trustees, if he sees fit so to do; and in the second place, it changes the persons who are entitled to vote upon the question of abolishing from the "taxable inhabitants" to the "legal voters" of the district, which had given rise to some litigation; but otherwise, the act of 1860 left the law as it found it. By force of the act of 1860, the superintendent may proceed to abolish without the trustees, or, if he sees fit, he may permit them to be associated with him by force of the provisions of the statute; in which latter case the superintendent and the trustees, if they are associated by the act of the town com-

State v. Barrett et al.

mittee, become a tribunal acting as one body upon the subject matter of abolishing the district.

In this case the superintendent did not see fit to proceed under the act of 1860 and abolish these districts by his sole authority, with the assent of the legal voters. He might have done so if he had seen fit, but he did not so see fit. If he had so done, there would have been several important things to have been decided by him judicially. In the first place, he would have been called to decide whether each person offering to give his assent was a legal voter; and, in the second place, whether the majority of such legal voters gave a legal assent to such abolishment.

But as we have said, the superintendent did not see fit to proceed under the authority given him by the act of 1860. He avoided that responsibility, and instead of deciding these very important matters himself and upon his own responsibility to the public, he called together, as appears by the certificate of abolishment, a board of judges entirely novel to our school laws, *viz.*, a board composed of himself and two out of three of the trustees of all the three districts proposed to be abolished, making a tribunal of seven persons. But this board, so constituted, had the same legal questions to decide as the superintendent would have had if he had sat alone, *viz.*, whether each person who offered to vote was a legal voter of the district, and whether he and a majority like him gave a legal assent to the abolishment. What does this certificate of abolishment show upon its face ? It shows that this board, so composed, decided that the majority of the legal voters of each district respectively assented that the three districts should be abolished. What jurisdiction had this board, so constituted, to decide any such thing? The superintendent alone had a right to decide that the legal voters of any particular district assented; but he, if alone, would not have had a right to decide that the legal voters of each district had a right to assent to a dissolution of all three of the districts. The legal voters of one district could only assent to the dissolution of their own particular

district, and not to the dissolution of three districts in gross, or to the dissolution of any other district except their own. But again : what power had this tribunal thus constituted to decide upon the assent of the legal voters of any one particular district? The board had to decide three things judicially —1st, whether each voter was a legal voter; 2d, that such voter gave a legal assent to the abolishment; and, 3d, that a majority of the legal voters of the district gave a legal assent to the abolishment. What right had such a board to judicially decide any of these questions? The superintendent alone might, or perhaps the superintendent with the three trustees of the district might, but what right had the trustees of any other district to come into their consultation or form a constituent part of the tribunal to decide whether another district should be abolished? Clearly none.

It was suggested, at the argument, that the action of the trustees of the other townships, or of all except the superintendent, was mere surplusage. But this is clearly not so. How can we tell by whose judgment it was that it was decided who were legal voters? or who gave a legal assent? or, if a majority of any particular district assented? It purports, upon the face of the certificate, to be the joint act of the whole board, and for aught we can know to the contrary each district was abolished by the judgment of the trustees of other districts, and that, too, without the concurrence of the superintendent. This abolishing of incorporated school districts is a matter of very grave importance. They are incorporated and empowered to purchase and hold real and personal estate, or to receive and hold that which may be given, devised, or bequeathed to them for the use of public schools, in any quantity, and to raise money by taxes. What is to become of this property in case these corporations are abolished?

Suppose thirteen men are sworn on a jury and twelve only render a verdict, is the verdict good for anything? Would the thirteenth man on the jury be merely a surplus? Clearly not.

The abolishing, therefore, of these districts by this board is a nullity, because the certificate shows upon its face that there has been no legal ascertainment that it was done with the assent of a majority of the legal voters of any of the districts. But if we go from the certificate to the proof, we will see that there never really was any legal ascertainment that the majority of the legal voters of any of these districts assented to the abolishment of any one of them.

In the first place, the only evidence of the assent of the majority to the abolishment of the district of St. Mark's, upon which the board acted, was a paper purporting to be signed by residents and legal voters in said district, in the following words:

"To Hiram Ingolsby, superintendent of public schools of Orange: The undersigned residents and legal voters of St. Mark's school district, with the view and for the purpose of securing a more efficient organization of our public schools, respectfully ask that the limits of their districts be so enlarged as to embrace two or more of the other more central districts in our town," and signed by a number. This paper the board received and acted on as an assent by a majority of the legal voters of the district to abolish the district altogether.

But this, so far from being an assent to abolish, actually asks for its enlargement. Instead of being an assent to its abolishment, it is a petition for its enlargement. We cannot well imagine a thing more unlike an assent to abolishment than a petition for its enlargement. They are as nearly the opposite of each other as two things well can be. And yet the board took this as evidence of an assent to abolish, and undertook to abolish it accordingly. Abolishing a district and enlarging it have very different legal effects. If only enlarged, the corporation keeps all its property and forfeits no rights, but may lose all by its abolishment. But this petition does not even show that the signers assented to St. Mark's being incorporated or merged in the two districts of Central and Ashland. It ought to have gone further, and shown that the legal voters of St. Mark's assented to be

merged in these very identical districts, *viz.*, the Central and Ashland, before any authority was given to the superintendent, whether without the trustees, to merge the three districts into one.

But again : supposing the names to this paper are a majority, and that the assent is sufficient, so far as regards its terms, could the legal assent of the majority of the legal voters be obtained in the way this was? No public meeting of the legal voters was called; but the superintendent employed a man to go around with this petition from house to house and procure the signatures. Is this the legal assent contemplated by the statute? It appears to me that the act contemplates a meeting together of the legal voters of the district, and their action upon the proposition as an organized body. It appears to me that the assent given to abolish a district should in some way appear to be the simultaneous act of the majority of the legal voters.

It is not necessary to pursue the question of the radical differences between the assent of individuals and the assent of a majority acting simultaneously, as they are obvious upon the slighest inspection.

The assent of the legal voters of the other districts to this abolishment is much weaker than even that of St. Mark's. I think the three districts were never legally abolished, and consequently that the tax was illegally imposed, and that the abolishment and the vote imposing the tax should be declared void as against the prosecutors.

Proceedings set aside.